Certiorari Denied, No. 31,652, April 28, 2009

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMCA-055

Filing Date:  March 13, 2009

Docket No. 26,678

STATE OF NEW MEXICO,

     Plaintiff-Appellee,

v.

CLIFFORD D. BALENQUAH,

     Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF CATRON COUNTY
Edmund H. Kase III, District Judge

Gary K. King, Attorney General
Santa Fe, NM
James W. Grayson, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

OPINION

KENNEDY, Judge.

{1}     Appellant David Balenquah (Balenquah) appeals his conviction for voluntary manslaughter in the stabbing death of his cousin Andrew Zuni (Zuni).  At trial, Balenquah advanced a theory of self-defense and attempted to demonstrate what he alleged were Zuni's violent propensities.  The State first disclosed evidence of Zuni's criminal history during the

1

trial. Balenquah argues that the State's failure to disclose such evidence earlier violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963). He also argues that the district court improperly precluded him from cross-examining two witnesses with specific instances of Zuni's conduct. In separate issues, Balenquah contests the sufficiency of the State's facsimile search warrant and argues that this case presents cumulative error.

**{2}** We hold that the State's delayed evidentiary disclosure complies with *Brady* because the evidence in question was not material. Likewise, we hold that the court's exclusion of evidence did not impair Balenquah's defense, and we conclude that the State's facsimile warrant was sufficient on these facts. No cumulative error exists in this case. We affirm the district court.

**Background**

**{3}** The following facts are undisputed. Balenquah and Zuni went elk hunting in southwest New Mexico on December 13, 2003. After killing an elk and dressing it for transport, they went to Uncle Bill's Bar in Reserve where they had drinks with Anthony and Miguel Jiron. The group split up, and Zuni and Balenquah left Uncle Bill's in Zuni's truck, heading back to Albuquerque along State Road 12. Soon thereafter, Zuni was knifed. He died from his wounds in a pool of blood along State Road 12.

**{4}** Joshua Johnson and his wife were driving along State Road 12 that evening. They saw Balenquah in the road next to Zuni's truck and stopped to investigate. Balenquah asked the Johnsons for a ride to Albuquerque, but they refused and left, as they were not traveling in that direction. Rosie and Pat Aragon, who were also driving along State Road 12, saw Balenquah, stopped, and agreed to drive him to their home where he could use the telephone. On the way they passed Zuni, still alive, covered in blood, and kneeling on the side of the road. Zuni waved at them in an apparent effort to get help, but they were frightened and continued home with Balenquah in the back seat.

**{5}** When they arrived home, Mrs. Aragon called the police and reported what had happened. The police responded first to the area where Zuni was seen, but he was dead when they arrived. Police next proceeded to the Aragons' home where they found Balenquah, his hands and clothes bloody. They arrested Balenquah and took him into custody.

**{6}** The police sought and were issued three warrants. The judge received the applications for the warrants by facsimile and returned the signed warrants by facsimile. The first warrant authorized the police to recover physical evidence from Balenquah's person, clothing, and shoes. The other two authorized police to recover physical evidence from Zuni's truck.

**{7}** Balenquah was charged on an open count of murder pursuant to NMSA 1978, Section 30-2-1 (1994), and his case was tried before a jury on December 7-13, 2004. The

2

State argued that Balenquah stabbed and killed Zuni. Balenquah staked his defense to the theory that Zuni was a bully, an enormous man who harassed those weaker than himself. He argued that Zuni became angry at him and made a variety of threatening remarks during the drive home from Uncle Bill's. The foul remarks, Balenquah contended, ultimately culminated in Zuni attacking him in the truck. In order to protect himself, Balenquah argued, he defended himself against Zuni's attacks and fled for his life.

**{8}** At trial, the State first called Rosie and then Pat Aragon, who both testified about what they experienced on December 13, 2003. The State then called Joshua Johnson, who likewise testified to what happened that evening. Fourth was Anthony Jiron, who gave testimony about Zuni's good character. When Balenquah attempted to cross-examine Anthony Jiron with evidence that Zuni had once "r[u]n over his girlfriend," the State lodged an objection, which the court sustained on the basis of improper foundation.

**{9}** In the wake of this objection, Balenquah alerted the court to the fact that the report on Zuni from the National Crime Information Center (NCIC), turned over by the State during discovery, was incomplete and covered only traffic violations. The State agreed that the original NCIC report it turned over was for traffic offenses only. Aware that the full NCIC report contained a variety of criminal charges, some of which were violent in nature, the State then offered the full report. Balenquah moved for a mistrial, arguing that the State's actions violated *Brady*. The district court suspended its ruling on the motion and allowed the trial to proceed. When the court finally revisited the issue of the NCIC report, the parties agreed to remedy the matter by allowing the entire report to come in as evidence, and on this basis the court heard no more argument on the matter.

**{10}** During closing argument, Balenquah asserted that Zuni had a propensity for violence and that the complete NCIC report, then already admitted into evidence, was the proof. After deliberation, the jury returned a verdict of guilty on the charge of voluntary manslaughter, and the court entered judgment, sentencing Balenquah to an incarceration period of six years.

**Discussion**

**1. Balenquah's Rights Under *Brady* Were Not Violated**

**{11}** Balenquah argues that the State violated his rights under *Brady* when it failed to turn over Zuni's complete NCIC report prior to trial. An alleged *Brady* violation constitutes a charge of prosecutorial misconduct. *State v. Trujillo*, 2002-NMSC-005, ¶¶ 48, 50, 131 N.M. 709, 42 P.3d 814. We review such charges for abuse of discretion "because the trial court is in the best position to evaluate the significance of any alleged prosecutorial errors." *Case v. Hatch*, 2008-NMSC-024, ¶ 47, 144 N.M. 20, 183 P.3d 905 (internal quotation marks and citation omitted). When reviewing for abuse of discretion, we will affirm the trial court "unless its ruling [was] arbitrary, capricious, or beyond reason." *Id.* (alteration in original) (internal quotation marks and citation omitted).

**{12}** In *Brady*, the United States Supreme Court held that the prosecution violates a defendant's due process rights when it suppresses evidence favorable to the defense. *Brady*, 373 U.S. at 86. A defendant must prove three elements under *Brady*. First, the evidence must have been "suppressed" by the prosecution. Second, the evidence must have been favorable to the defendant. And third, the evidence must have been material to the defense. *Trujillo*, 2002-NMSC-005, ¶ 50. Balenquah fails to prove the third element.

**{13}** We assume without deciding that Balenquah satisfied *Brady's* first two elements: that the evidence was suppressed and that the evidence was favorable to him. However, Balenquah fails to convince us of the report's materiality. In order for evidence to be material under *Brady*, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Trujillo*, 2002-NMSC-005, ¶ 50 (internal quotation marks and citation omitted). To properly consider the materiality of evidence under *Brady*, we analyze it in relation to the record as a whole. *State v. Baca*, 115 N.M. 536, 541, 854 P.2d 363, 368 (Ct. App. 1993). Evidence that appears material at first blush "can lose its potency when weighed and measured with . . . other evidence, both inculpatory and exculpatory." *Id.*

**{14}** The NCIC report became an issue on the second day of trial at the end of the testimony of Anthony Jiron, the first witness to testify for the State regarding Zuni's reputation and character. Balenquah thus enjoyed the opportunity to utilize the full report for the remainder of his five-day trial. We note that although some of Zuni's criminal history in the NCIC report might have been probative of this victim's character under Rule 11-404(A)(2) NMRA, it is likely that at least some of this evidence, had it been introduced during testimony, would have been hotly contested by the State as irrelevant or prejudicial. Despite this, Balenquah and the State reached an agreement on the next-to-last day of the trial that the full NCIC report would be submitted "for the jury's consideration." The admission of the full report, therefore, gave Balenquah an advantage he otherwise might have been denied under Rule 11-404(B). We consider his closing argument illustrative. There, he directed the jury's attention to Zuni's record in the full NCIC report. Balenquah stated that Zuni's history indicated "[a]rrest after arrest after arrest" as well as "[b]attery against a household member." The inference, of course, was that Zuni was violent. On these facts, we hold that the State's failure to turn over the full report to the defense until the second day of trial was immaterial when offset by Balenquah's use of it as evidence that was before the jury.

**{15}** We note here that even if Balenquah were able to make his case under *Brady's* three elements, his Brady claim would likely still fail. In *State v. Rondeau*, 89 N.M. 408, 418, 553 P.2d 688, 698 (1976), our Supreme Court held that no *Brady* violation exists where evidence is found *during* trial as opposed to *after* trial. The Court interpreted *Brady* "to mean that a convicted defendant [is] entitled to a retrial where the prosecution suppresse[s], *throughout the whole trial*, exculpatory evidence material to the guilt or punishment of the defendant." *Id.* (emphasis added).

4

## 2.    Balenquah's Rights Were Not Violated by the Exclusion of Evidence

**{16}**    Balenquah argues that he should have been allowed to introduce evidence of specific acts on the part of Zuni during his cross-examination of the Jirons for the purpose of showing that Zuni had violent tendencies.  The district court excluded this evidence over Balenquah's insistence that it was necessary for his rebuttal of the State's testimony concerning Zuni's good reputation and for Balenquah's self-defense claim.  Balenquah had raised Zuni's character as a bully in his opening statement.

**{17}**    During trial, Anthony Jiron testified that Zuni did not drink and that he did not regard Zuni as either violent or a bully because he had never seen Zuni get into any altercations.  Balenquah did not object to this testimony.  On cross-examination, Balenquah's attorney attempted to question Anthony Jiron about an incident in which Zuni allegedly ran over his girlfriend.  This drew an objection from the State as to the foundation for questioning Zuni's criminal history, causing defense counsel to cite a partial NCIC report indicating that Zuni had previously been convicted of burglary and aggravated battery.  The trial court sustained the objection.  Miguel Jiron testified that he had never seen Zuni act "rowdy."  During the cross examination of Miguel Jiron defense counsel did not pursue any questions concerning Zuni's previous record.  Following Miguel Jiron's testimony, the trial broke for lunch, and during the break the district court chastised the prosecution for failing to provide the defense with the complete NCIC report for Zuni.  The report showed no convictions but a number of charges, including ones involving interpersonal violence.  The district court again denied a request by the defense to cross-examine based on the report, talking about the balance between the State's eliciting evidence of Zuni's good character, the lack of knowledge about the identities of the complaining witnesses in those cases, and the right of the jury to know that negative information about Zuni existed.  The State later suggested that the complete NCIC report be admitted as evidence, and defense counsel agreed.

**{18}**    The prosecution asked Anthony Jiron about Zuni's peaceable character before Balenquah raised any issue of Zuni's aggressiveness.  Rule 11-404(A)(2) is an exception to the general inadmissibility of character evidence allowing evidence of the peaceful character of a victim "offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor."  The prosecution jumped the gun by offering this evidence improperly in its case in chief.  Because Balenquah did not raise this prosecutorial impropriety at trial, and because we do not consider arguments not preserved below, *State v. Varela*, 1999-NMSC-045, ¶ 25, 128 N.M. 454, 993 P.2d 1280, we do not address this impropriety.

**{19}**    After these witnesses testified, and in the course of argument concerning the NCIC report and the admissibility of previous incidents involving violence, the district court ruled that Balenquah would be allowed to present specific instances of Zuni's prior conduct.  The court and parties understood at that point that the defense would attempt to contact Zuni's alleged victim, which proved to be impossible.  After arguing the impact of the failure by the State to produce the NCIC report in a timely fashion and the impact of the lack of

evidence to support his self-defense claim, the defense accepted the State's suggestion that the entire NCIC report be presented to the jury. The defense, in its case, presented witnesses who testified that Zuni was a bully with a reputation for violent behavior and cross-examined rebuttal witnesses as to their knowledge of Zuni's reputation and any prior instances of violent conduct of which they might have been aware. The defense raised Zuni's criminal record to the jury in its closing argument.

**{20}**    We hold that Balenquah was not deprived in any meaningful manner of the right to present his self-defense claim to the jury. The district court's early rulings agreed with his right to cross-examine based on specific instances of conduct but limited the questions owing to the limited knowledge as to what those instances were. At all times, the district court expressed its willingness to allow Balenquah to present the evidence through other witnesses, and later allowed him to do so, both by calling his own witnesses and by cross-examining the State's remaining witnesses.

**{21}**    Rule 11-404(A)(2) allows a defendant to introduce evidence of a pertinent character trait of the victim. Rule 11-405(A) NMRA generally requires that this be accomplished by reputation or opinion evidence, but specific instances of conduct are allowed where the victim's character is an element of a charge or defense. Rule 11-405(B). Our Supreme Court, in *State v. Armendariz*, 2006-NMSC-036, ¶ 17, 140 N.M. 182, 141 P.3d 526, has held that a victim's violent character is not an element of self-defense but can be circumstantial evidence of a victim's character trait, known by the defendant, to which the victim was conforming at the time of the incident. *Armendariz* therefore limited the type of evidence allowed as proof of such a trait to reputation or opinion evidence. *Id.* A limited exception to this rule allows cross-examination of witnesses as to specific instances of conduct. Rule 11-405(A).

**{22}**    We hold that under these circumstances the district court comported with the law because it allowed limited cross-examination during the State's case and accorded Balenquah the opportunities to establish his claim of self-defense as might be established by any previous history of violence on Zuni's part. The question of whether Zuni actually engaged in the prior incidents took a back seat to addressing  the negative impact of incomplete discovery. Balenquah was allowed sufficient latitude in questioning the Jirons, he called and questioned his own witnesses, and he properly examined the State's rebuttal witnesses.   Admission of the entire NCIC report was likely beyond the bounds of admissibility. *State v. Christopher*, 94 N.M. 648, 651, 615 P.2d 263, 266 (1980).

### 3.    The State's Facsimile Warrant Was Proper

**{23}**    Immediately after Zuni's death, the State obtained three warrants by facsimile. The first authorized the recovery of evidence from Balenquah's clothes and shoes, and the other two authorized the recovery of evidence from Zuni's truck. Balenquah challenges only the first of these. He argues that New Mexico law makes no provision for warrants by facsimile except under exigent circumstances. And because this case involved no such circumstances,

6

he contends that the State's warrant and any evidence obtained as a result were unlawful and that the physical evidence seized should have been suppressed. He therefore asks us to reverse his conviction. We refuse to do so on the basis that: (1) the warrant issued by the State complies with the plain language of Rule 5-211 NMRA, and (2) a warrant under the circumstances was supererogatory.

**{24}** We review the sufficiency of search warrant affidavits de novo. *State v. Garcia*, 2002-NMCA-050, ¶ 7, 132 N.M. 180, 45 P.3d 900 (citing *State v. Whitley*, 1999-NMCA-155, ¶ 3, 128 N.M. 403, 993 P.2d 117).

**{25}** The State's warrant complies with the plain language of Rule 5-211. That Rule states that "[a] warrant shall issue only on a sworn written statement of the facts showing probable cause for issuing the warrant," Rule 5-211(A), and that the issuing court "*may* require the affiant to appear personally" for examination under oath. Rule 5-211(E) (emphasis added). The drafters have made the first requirement mandatory: a valid warrant *must* be supported by a sworn, written statement—that is to say, an affidavit. Balenquah does not dispute that the State complied on this score. But he would have the State's affiant jump through the additional hoop of physical presence, and the plain language of Rule 5-211(E) demonstrates his mistake. This rule is permissive: a court *may*, in its discretion, require the physical presence of the affiant for the purpose of vetting him under oath. Such permissive language precludes the mandatory physical presence of the affiant. In this case, the issuing judge did not require physical presence, and a close reading of Rule 5-211 satisfies us that the decision was the judge's to make.

**{26}** Even if we presume the insufficiency of facsimile warrants, we would still hold the error harmless under the plain view exception to the warrant requirement. Under the plain view exception, "items may be seized without a warrant if the police officer was lawfully positioned when the evidence was observed, and the incriminating nature of the evidence was immediately apparent, such that the officer had probable cause to believe that the article seized was evidence of a crime." *State v. Zamora*, 2005-NMCA-039, ¶ 19, 137 N.M. 301, 110 P.3d 517 (internal quotation marks and citation omitted). Probable cause exists when an officer has good reason to believe that the person has committed a felony. *State v. Saiz*, 2008-NMSC-048, ¶ 13, 144 N.M. 663, 191 P.3d 521.

**{27}** Here, under the plain view exception, police could have seized the "blood, tissue, fibers, clothing and shoes" from Balenquah's person without a warrant. The police arrested Balenquah at the Aragons' home. At that time police observed "blood on his hands and clothes." The Aragons told police that they picked up Balenquah along the side of State Road 12 in the area of mile marker 33. The police had just come from that location where they found Zuni's dead body and "[l]arge quantities of blood." Balenquah told police that he and Zuni had engaged in a "heated argument" while driving along State Road 12.

**{28}** Neither party disputes that the police were lawfully positioned when they observed Balenquah at the Aragons' home or when they discovered Zuni's body at mile marker 33.

Likewise, based on the facts known to the police when they saw Balenquah, it was a reasonable conclusion that the blood on Balenquah's person was evidence pertaining to the possible murder of Andrew Zuni. Under these circumstances, the police's procurement of a warrant was an unnecessary precaution.

**4.     Balenquah's Case Presents No Cumulative Error**

**{29}**     Balenquah urges us to adopt his reasoning to hold that the district court's errors, taken together, constitute cumulative error. We refuse to do so. As should be apparent by our reasoning above, the district court's conduct admits no errors, and we must therefore reject Balenquah's cumulative error argument.

**Conclusion**

**{30}**     We affirm the judgment of the district court and hold that: (1) Balenquah has failed to sound a proper claim under *Brady*, (2) Balenquah's right to cross-examine witnesses against him was not violated by the court's exclusion of evidence, (3) the State's facsimile warrant was sufficient, and (4) there is no cumulative error warranting reversal.

**{31}     IT IS SO ORDERED.**

_____
**RODERICK T. KENNEDY, Judge**

**WE CONCUR:**


_____
**CYNTHIA A. FRY, Chief Judge**


_____
**JAMES J. WECHSLER, Judge**

**Topic Index for *State v. Balenquah*, No. 26,678**

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DP | Due Process |
| CT-MS | Misconduct by Prosecutor |
| CT-SU | Suppression of Evidence |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-SD | Self-defense |
| CL-VM | Voluntary Manslaughter |
| | |
| **CA** | **CRIMINAL PROCEDURE** |

| | |
|---|---|
| CA-DU | Due Process |
| CA-MP | Misconduct by Prosecutor |
| CA-PE | Production of Evidence |
| CA-SW | Search Warrant |
| CA-SD | Self-defense |
| | |
| **EV** | **EVIDENCE** |
| EV-CE | Character Evidence |
| EV-EE | Exclusion of Evidence |
| EV-CU | Cumulative Evidence |
| EV-PA | Prior Acts or Statements |
| EV-PC | Prior Convictions or Judgments |
| EV-SU | Suppression of Evidence |